IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:20-CV-151-FL

| | |
|---|---|
| NORTH CAROLINA COASTAL FISHERIES REFORM GROUP, JOSEPH WILLIAM ALBEA, DAVID ANTHONY SAMMONS, CAPTAIN SETH VERNON, CAPTAIN RICHARD ANDREWS, and DWAYNE BEVELL, <br><br> Plaintiffs, <br><br> v. <br><br> CAPT. GASTON LLC; ESTHER JOY, INC.; HOBO SEAFOOD, INC.; LADY SAMAIRA INC.; TRAWLER CAPT. ALFRED, INC.; TRAWLER CHRISTINA ANN, INC.; and TRAWLERS GARLAND AND JEFF, INC., <br><br> Defendants.[1] | ORDER |

This case brought pursuant to the Federal Water Pollution Control Act of 1972 ("Clean Water Act" or the "Act"), 33 U.S.C. § 1251 et seq., concerning shrimp trawling activities, is before the court on defendants' motions to dismiss for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1), (DE 35, 39), to dismiss for failure to state a claim, pursuant to Rule 12(b)(6), (DE 32, 37), and to strike plaintiffs' evidentiary documents filed in response (DE 48, 50). Also before the court is plaintiffs' motion for leave to amend their complaint (DE 58). The motions have been

---

[1] The court constructively has amended the caption of this order to reflect the voluntary dismissal of prior defendant North Carolina Department of Environmental Quality, Division of Marine Fisheries, by plaintiffs (DE 45).

briefed fully, and the issues raised are ripe for ruling. For the following reasons, defendants' motions to dismiss for lack of subject matter jurisdiction are denied, but their motions to dismiss for failure to state a claim are granted. Defendants' motions to strike and plaintiffs' motion for leave to amend are denied.

## STATEMENT OF THE CASE

Plaintiffs consist of plaintiff North Carolina Coastal Fisheries Reform Group ("Reform Group"), a nonprofit organization "dedicated to protecting North Carolina's coastal and marine public trust resources" and to "promot[ing] sustainable fishing practices," (Compl. ¶ 6), and plaintiffs Joseph William Albea ("Albea"), David Anthony Sammons ("Sammons"), Captain Seth Vernon ("Vernon"), Captain Richard Andrews ("Andrews"), and Dwayne Bevell ("Bevell") (collectively the "individual plaintiffs"), who all "live, work and recreate around North Carolina's coastal waters and depend on North Carolina's fisheries." (Id. at 1). Additionally, plaintiffs Albea and Sammons are founding members of plaintiff Reform Group. Plaintiffs commenced this action August 4, 2020, asserting that defendants, corporate owner-operators of various shrimp trawling vessels, have violated the Clean Water Act and the North Carolina state law principle known as the public trust doctrine, through their shrimp trawling activities in North Carolina coastal waters.

Plaintiffs claim defendants have violated the Act through unpermitted discharges of pollutants and dredged materials into navigable waters. Plaintiffs seek judicial declarations of defendants' violations of state and federal law, injunctions preventing defendants from continuing the allegedly illegal shrimp trawling operations, imposition of civil penalties, and award of costs.

Defendants Capt. Gaston LLC ("Capt. Gaston"), Hobo Seafood, Inc. ("Hobo Seafood"), Lady Samaira, Inc. ("Lady Samaira"), Trawler Capt. Alfred, Inc. ("Capt. Alfred"), Trawler Christina Ann, Inc. ("Christina Ann"), and Trawlers Garland and Jeff, Inc. ("Garland & Jeff")

(collectively the "Trawler Defendants") have joined together in moving to dismiss for failure to state a claim and for lack of jurisdiction. (DE 37, 39). Defendant Esther Joy, Inc. ("Esther Joy") seeks to rid itself of this lawsuit with separate, similar motions. (DE 32, 35). Defendants incorporate and rely upon all arguments made in support of dismissal. (See Def. Esther Joy's 12(b)(6) Mem. (DE 33) at 12 n.4; Def. Esther Joy's 12(b)(1) Mem. (DE 36) at 5 n.1; Trawler Defs.' 12(b)(6) Mem. (DE 38) at 7 n.2; Trawler Defs.' 12(b)(1) Mem. (DE 40) at 6 n.2).[2]

Defendant Esther Joy, in support of its Rule 12(b)(1) motion specifically relies upon: 1) excerpts from scientific research papers; 2) reports, documents, and transcripts from hearings, all by the North Carolina Division of Marine Fisheries ("DMF"); 3) a transcript of the radio interview of one of scientific research paper's author; 4) a page from plaintiff Reform Group's website; 5) an online news article; and 6) a letter from DMF to plaintiff Albea in his role with plaintiff Reform Group. In support of its Rule 12(b)(6) motion, defendant Esther Joy relies on correspondence exchanged between it and the United States Army Corps of Engineers. While the Trawler Defendants do not rely on any documents in support of their 12(b)(1) motion, they introduce in support of their Rule 12(b)(6) motion a news release by plaintiff Reform Group.

Plaintiffs' response to the Rule 12(b)(1) motions leans upon numerous affidavits, including those of plaintiffs Albea, Sammons, Andrews, Vernon, and Bevell. Plaintiffs also rely upon plaintiff Sammons's testimony by affidavit on behalf of plaintiff Reform Group, accompanied by 1) a National Marine Fisheries Service technical memorandum; 2) satellite imagery of the Pamlico Sound; 3) scientific research papers and excerpts thereof; 4) a capture of a webpage regarding the Chesapeake Bay; 5) a United States Geological Survey article; 6) Environmental Protection Agency summaries of water pollution reporting categories; 7) North Carolina Department of

---

[2]    For ease of reference, here and throughout, the court uses the page numbers assigned by its case management and electronic case filing system ("CM/ECF").

Environmental Quality and Albemarle Resource Conservation and Development Counsel articles on algal blooms; 8) an online news article; and 9) a document labeled "Florence Commercial Fishing Payment Analysis."

Additionally, defendants have filed motions to strike materials relied upon by plaintiffs in defense of their motions. Plaintiffs have moved for leave to file an amended complaint, which seeks to add Lee Bland Williams ("Williams"), the purported owner-operator of the shrimp trawling vessel Blackbeard, as a defendant. All these motions come now before this court.

## STATEMENT OF THE FACTS

The facts alleged in the complaint may be summarized as follows.

Plaintiff Reform Group's membership includes small business owners and recreational fishers who rely on North Carolina's fisheries for their livelihoods and recreation. In addition to being the founding members of plaintiff Reform Group, plaintiffs Albea and Sammons are also recreational fishermen. Plaintiffs Vernon and Andrews are professional fishing guides, the continuing viability of which depends on the health and quality of North Carolina's fisheries, who also fish recreationally in North Carolina's coastal waters. Finally, plaintiff Bevell is a tackle shop owner, whose business primarily comes from recreational fishers and tourists. All of the plaintiffs advocate for improved fisheries practices in North Carolina to ensure the long-term health of North Carolina's fisheries and to mitigate or undo damage to the fisheries already caused by commercial trawling activities.

On the other side, defendants operate various shrimp trawling vessels in North Carolina coastal waters,[3] including, specifically, the Pamlico Sound. Plaintiffs allege defendants have

---

[3] Plaintiffs define coastal waters as "inshore waters . . . as well as those ocean waters up to three nautical miles from the shore, all of which are subject to North Carolina's jurisdiction," relying specifically on N.C. Gen. Stat § 113-129(4)'s definition of coastal fishing waters. (Compl. at 3 n.2); see also N.C. Gen. Stat. § 113-124(4) (defining coastal waters, in reference to the state's conservation agencies, as "[t]he Atlantic Ocean; the various coastal sounds; and

4

caused significant harm to North Carolina's coastal waters and its fisheries through the use of "non-selective, destructive trawling equipment to harvest shrimp." (Id. at 2).

The setting of the instant dispute is primarily the Pamlico Sound, "the largest embayed estuary in the world." (Id. ¶ 33). Pamlico Sound is an "essential habitat" for juvenile shrimp of various species as well as the home to mature shrimp of those same species, harvested for commercial sale. (Id. ¶ 35). However, Pamlico Sound is also an "essential spawning and nursey habitat for many finfish species," including the Atlantic croaker. (Id. ¶ 36). Juvenile finfish of varying species "remain in the Pamlico Sound until they may migrate to nearshore ocean waters." (Id. ¶ 37).

This process allegedly is disturbed by defendants' harvesting of shrimp in Pamlico Sound by dragging trawl nets along the bottom of the Pamlico Sound. These nets capture both shrimp and "whatever other fish and marine species that are unable to escape," meaning that the nets are "non-selective." (Id. ¶¶ 38-39). The "unwanted" portion of the catch is referred to as "bycatch," and those fish and marine species are "routinely . . . caught, injured, killed, and discarded." (Id. ¶ 39). Plaintiffs allege that "[i]t is generally accepted that for every one pound of shrimp harvested in North Carolina coastal waters, roughly four pounds of bycatch are discarded." (Id. ¶ 40). For example, in 2017, 14 million pounds of shrimp were caught in North Carolina waters, with 8.5 million of that coming from Pamlico Sound, alone. This, based on plaintiffs' proffered ratio, equates to 34 million pounds of bycatch being discarded in Pamlico Sound.

And this bycatch is discarded back into North Carolina coastal waters more generally. According to the complaint, "[t]his large-scale disposal of dead and decomposing fish and marine species results in significant increases in organic matter and nutrient pollution" in the impacted

estuarine waters up to the dividing line between coastal fishing waters and inland fishing waters agreed upon by the Marine Fisheries Commission and the Wildlife Resources Commission").

5

marine environment.  (Id. ¶ 41).  The resultant pollution allegedly "encourages eutrophication, which decreases dissolved oxygen levels in the water, among other deleterious pollution effects." (Id.).

More directly, being caught as bycatch allegedly prevents juvenile fish "from joining the adult population, and . . . eventually spawning and adding to future juvenile populations." (Id. ¶ 44).  Accordingly, plaintiffs allege that some "North Carolina[] fisheries have experienced steep and species threatening declines in certain finfish populations," which has correspondingly resulted in "fishing seasons for those species . . . clos[ing] prematurely" or not opening at all.  (Id. ¶ 44).  Ergo, plaintiffs allege that shrimp trawling, through its impact on North Carolina fisheries, "has direct negative consequences for commercial and recreational fishing opportunities and North Carolina's coastal economy." (Id. ¶ 46).

Plaintiffs allege that shrimp trawling has other, more tangential, impacts.  For example, they allege that "high-level fish and marine species" that rely on juvenile finfish "as a primary food source" are harmed by this depletion and have a diminished ability to survive in their current habitat. (Id. ¶ 47).  Additionally, as trawls are dragged along the bottoms of North Carolina coastal waters, "the habitats of bottom-dwelling species" allegedly are damaged and sediment is disturbed, becoming "re-suspended in the water," thereby polluting the coastal waters.  (Id. ¶¶ 48, 51).

Plaintiffs allege that these defendants, specifically, "are among the largest trawling operations in the State of North Carolina and trawl for shrimp in North Carolina coastal waters, including the Pamlico Sound," meaning that their operations have, accordingly, resulted in "millions of pounds of bycatch" that is discarded, as described above, into North Carolina coastal waters.  According to the complaint, defendants' "shrimp trawling activities result in the bottoms of ecologically- and commercially-important fisheries being dredged, thereby harming fish and

6

marine species by destroying habitats, including oyster habitat, and re-suspending sediments that pollute coastal waters, including the Pamlico Sound." (Id. ¶ 51). This impact threatens and endangers fish and other marine species' ability to propagate and maintain their populations, which, along with the degraded marine and estuarine habitats, "directly threaten[s] the State's coastal economy that depends upon commercial and recreational fishing and tourism." (Id. ¶ 54).

## COURT'S DISCUSSION

A.   Motions to Dismiss for Lack of Subject Matter Jurisdiction

1.   Standard of Review

A motion to dismiss under Rule 12(b)(1) challenges the court's subject matter jurisdiction. Such motion may either 1) assert the complaint fails to state facts upon which subject matter jurisdiction may be based, or 2) attack the existence of subject matter jurisdiction in fact, apart from the complaint. Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). When a defendant challenges the factual predicate of subject matter jurisdiction, a court "is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991). The nonmoving party in such case "must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists." Id.

2.   Analysis

 "To meet the constitutional minimum for standing, '[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 154 (4th Cir. 2000) (hereinafter Gaston Copper I) (alteration in original) (quoting Allen v. Wright,

468 U.S. 737, 751 (1984)).  "At least one plaintiff must demonstrate standing for each claim and form of requested relief."  Kenny v. Wilson, 885 F.3d 280, 287 (4th Cir. 2018).  "The party invoking federal jurisdiction bears the burden of establishing standing."  Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) (quotation omitted).  "[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation."  Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992).  Finally, the court's Article III jurisdiction to hear a case is a requisite "threshold matter" that must be resolved before deciding whether the complaint states a cause of action.  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 95 (1998).

Defendants challenge the existence of subject matter jurisdiction in fact, apart from the complaint, asking the court to look beyond the complaint's assertions of injury to determine whether they have suffered injury-in-fact, caused by defendants, and redressable by this court.  See generally Adams, 697 F.2d at 1219.[4]  Accordingly, the court regards plaintiffs' pleadings as mere evidence on the issue and looks to the materials beyond the pleadings as raised by the parties.  See Richmond, 945 F.2d at 768.

a.    Injury-In-Fact

"[A] party invoking the jurisdiction of a federal court [must] seek relief for a personal, particularized injury."  See Hollingsworth v. Perry, 570 U.S. 693, 715 (2013).  An injury must also be sufficiently "concrete," that is "de facto" or actually existing.  Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1548 (2016).  Further, that injury must be "actual or imminent, as opposed to conjectural

---

[4]    Defendant Esther Joy argues in the alternative that the case presents a nonjusticiable question. (See Def. Esther Joy's 12(b)(1) Mem. (DE 36) at 23-26).  However, the question, in part, before the court is whether defendants' conduct was violative of the Clean Water Act, resolution of which "sound[s] in familiar principles of [statutory] interpretation," meaning the "case does not turn on standards that defy judicial application."  See Zivotofsky ex rel. Zivotofsky v. Clinton, 566 U.S. 189, 201 (2012) (quotation omitted).  Therefore, dismissal based upon non-justiciability is not warranted.

or hypothetical." Long Term Care Partners, LLC v. United States, 516 F.3d 225, 231 (4th Cir. 2008); Gaston Copper I, 204 F.3d at 156 ("Federal jurisdiction cannot lie if the alleged injury is merely 'an ingenious academic exercise in the conceivable.'" (quoting United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 688 (1973))).

"Injury in fact is alleged adequately by 'environmental plaintiffs' when they 'aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity.'" Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 629 F.3d 387, 397 (4th Cir. 2011) (hereinafter Gaston Coper II) (quoting Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 183 (2000)). However, to claim this type of injury, plaintiffs "must use the area affected by the challenged activity and not an area roughly 'in the vicinity' of it." Lujan, 504 U.S. at 564-66.

Here, as defendants concede, plaintiffs have alleged the type of injury that courts have found cognizable under Article III, and defendants do not factually challenge such. (See Def. Esther Joy's 12(b)(1) Mem. (DE 36) at 10 ("We assume for our purposes at this preliminary stage of litigation these injuries meet the injury-in-fact test")). Plaintiffs allege that they "fish[] and recreate[] in the Pamlico Sound and other North Carolina coastal waters." (See, e.g., Compl. ¶ 9; accord ¶¶ 10-13). They allege that defendants' actions have negatively impacted their ability to recreate in the Pamlico Sound and other North Carolina coastal waters due to the decrease in finfish population due, ostensibly, to defendants' conduct. (See, e.g., Compl. ¶¶ 46, 51, 53-54). Ergo, they aver that they use the affected area and are persons for whom the recreational values of the area will be lessened by the challenged activity. This suffices for Article III injury at this juncture under Gaston Copper II and Laidlaw.

9

b.    Causation

This prong of standing requires that it is "likely that the injury was caused by the conduct complained of and not by the independent action of some third party not before the court." Gaston Copper I, 204 F.3d at 154.  However, this "does not mean that plaintiffs must show to a scientific certainty that defendant's effluent caused the precise harm suffered by the plaintiffs." Id. at 161 (quotation omitted).  Where a defendant is "at least in part responsible for" plaintiff's alleged injury "notwithstanding the presence of another proximate cause," plaintiff's injury is sufficiently traceable to defendant.  Libertarian Party of Va. v. Judd, 718 F.3d 308, 316 (4th Cir. 2013); accord WildEarth Guardians v. U.S. Dep't of Agric., 795 F.3d 1148, 1157 (9th Cir. 2015) ("So long as a defendant is at least partially causing the alleged injury, a plaintiff may sue that defendant, even if the defendant is just one of multiple causes of the plaintiff's injury.").

Plaintiffs' complaint alleges that defendants' "shrimp trawling activities pollute and degrade North Carolina's marine and estuarine environments" and that the degradation "directly threaten[s] the State's coastal economy that depends on . . . recreational fishing."  (Compl. ¶¶ 52-54).  They more specifically allege that shrimp trawling, writ large, through its "large-scale disposal of dead and decomposing fish and marine species" from bycatch "results in significant increases in organic matter and nutrient pollution in the marine environment" that "encourages eutrophication, which decreases dissolved oxygen levels in the water," an allegedly "deleterious pollution effect[]." (Id. ¶ 41).  Plaintiffs also allege that "[s]hrimping bycatch," in and of itself, removes juvenile fish from the population, preventing future generations of finfish and causing "some of North Carolina's fisheries . . . [to] experience[] steep and species-threatening declines in certain finfish populations," the decline of which "has dire negative consequences for commercial and recreational fishing opportunities" as related to the North Carolina coast. (See id. ¶¶ 44-46).

Finally, as relevant here, plaintiffs allege that defendants' shrimp trawling "results in the bottoms of . . . important fisheries being dredged, thereby harming fish and marine species by destroying habits . . . <u>and</u> re-suspending sediments that pollute coastal waters, including the Pamlico Sound." (<u>Id.</u> ¶ 51 (emphasis added)).

Defendants contend that, as a matter of fact, their shrimp trawling, inclusive of taking the finfish as bycatch, discarding the bycatch, and the alleged dredging, does not cause the injuries of which plaintiffs complain. For example, defendants assert that blue crab populations benefit from the carrion bycatch produces, that the carrion potentially destresses ecosystems plagued by eutrophication, and that "[r]epeated trawling disturbance also has positive effects on fish species." (<u>See</u> Def. Esther Joy's Rule 12(b)(1) Mem. (DE 36) at 13 & nn.4-5. At its heart, their argument is that "plaintiffs overstate the degree of impact and harm" of shrimp trawling. (<u>See</u> Trawler Defs.' 12(b)(1) Mem. (DE 40) at 10 (asserting that "bycatch ratios are lower than the levels cited by [p]laintiffs), 13 ("Plaintiffs do not and cannot establish these [d]efendants' actions in returning bycatch to the waters from which it was taken or the normal operation of their trawling net have a sufficient causal connection to the substantial finfish stock decline which they allege as their injuries.")).

Defendants also argue that plaintiffs' causation argument is scientifically fraught. (<u>See, e.g.</u>, Def. Esther Joy's 12(b)(1) Mem. (DE 36) at 17 ("The question of the decline of fish stock for North Carolina recreational fisher[ies] is a much debated question with <u>no hard science linking such decline to shrimpy bycatch</u>." (emphasis added)); Trawler Defs.' 12(b)(1) Mem. (DE 40) at 14. They point to other "separate and independent cause[s]" for the decline, exampling "the rise of predators" and "the impact of coastal development on water quality." (Def. Esther Joy's 12(b)(1) Mem. (DE 36) at 17; Trawler Defs.' 12(b)(1) Mem. (DE 40) at 14. They cite scientific

studies, administrative hearings, and historic restrictions on trawling equipment and activity's failure to coincide with an increase in finfish population. (See, e.g., Def. Esther Joy's 12(b)(1) Mem. (DE 36) at 18-19).

In response, plaintiffs put forth reports they purport stand for the proposition that "suspended and re-suspended sediment harms finfish" and that the carrion created by bycatch does in fact "lead[] to the depletion of dissolved oxygen in a water body, which directly harms finfish and other aquatic species." (Reform Group Aff. (DE 46-6) ¶¶ 8-9, at 85, 112-13, 125).[5] Plaintiffs also assert that their personal experiences in recreational fishing over the past years indicate to them that shrimp trawling is causing finfish population decline. (See Pls.' (12)(b)(1) Resp. (DE 46) at 15-16; e.g., Albea Aff. (DE 46-1) ¶¶ 10-11).

However, as defendants recognize, this court "does not sit as an arbiter of scientific theories of the cause of finfish decline of recreational fisheries in North Carolina." (Def. Esther Joy's 12(b)(1) Mem. (DE 36) at 19). Nor is it plaintiffs' responsibility to draft a complaint placing the question of causation of their injuries beyond scientific debate because the United States Court of Appeals for "the Fourth Circuit has rejected strict scientific tests for traceability and redressability." (Id. at 20). Rather, in this posture, the court need only determine whether plaintiffs have set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists as to the question of causation. See Richmond, 945 F.2d at 768. And, as detailed above, plaintiffs have raised this genuine issue, which the court is not permitted to resolve at this point in the proceedings.

---

[5] In their motions to strike, defendants seek to strike the documents appended to plaintiffs' response. The court in resolving a Rule 12(b)(1) motion permissibly "consider[s] evidence outside the pleadings" when defendants attack the existence of subject matter jurisdiction in fact, as they do here. Richmond, 945 F.2d at 768. This evidence may be in the form of affidavits. See Saval v. BL Ltd., 710 F.2d 1027, 1029 n.2 (4th Cir. 1983). While defendants question the admissibility of portions of plaintiffs' affidavits, defendants do not cite any precedent applying the trial or summary judgment evidentiary requirements to affidavits filed at this stage. The court, instead, considers the documents in the context of the caselaw discussed above in the text. Therefore, defendants' motions to strike are denied.

Instead, to show standing at the pleading stage, plaintiffs "must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern." Am. Canoe Ass'n v. Murphy Farms, Inc., 326 F.3d 505, 520 (4th Cir. 2003) (quotation omitted). Accordingly, the court cannot conclude that, at this stage, plaintiffs have failed to show that there is at least a factual dispute regarding whether plaintiffs' injuries have been caused by defendants. Instead, as here, where "the jurisdictional facts are inextricably intertwined with those central to the merits, the court should resolve the relevant factual disputes only after appropriate discovery, unless the jurisdictional allegations are clearly immaterial or wholly unsubstantial and frivolous." Kerns v. United States, 585 F.3d 187, 193 (4th Cir. 2009). The jurisdictional allegations in the complaint do not fall to the level of clearly immaterial, wholly unsubstantial, or frivolous, and, therefore, causation has been shown to the degree that Article III jurisdiction is proper.

As to defendants' argument that even accepting plaintiffs' alleged injuries-in-fact, those injuries do not have a causal nexus specifically to plaintiffs' Clean Water Act claims, their argument sounds in what the Supreme Court of the United States has characterized as statutory standing, rather than Article III standing. See Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 126-27 (2014) (distinguishing between statutory standing and Article III standing, and explaining that the determination of whether a "statute limited the class to plaintiffs whose injuries were proximately caused by a defendant's [statutory] violations" sounds in the first category). The process of matching plaintiffs' injuries to a cause of action that recognizes that injury as actionable, (see, e.g., Trawler Defs.' 12(b)(1) Mem. (DE 40) at 10 ("Plaintiffs Lack

Standing Under the Clean Water Act")), is best resolved within the inquiry into whether plaintiffs have stated a claim upon which relief can be granted. See Lexmark, 572 U.S. at 128 n.4.[6]

        c.      Redressability

An injury is redressable if it is "likely, and not merely speculative, that a favorable decision will remedy the injury." Gaston Copper I, 204 F.3d at 154; Equity in Athletics, Inc. v. Dep't of Educ., 639 F.3d 91, 100 (4th Cir. 2011) ("[N]o explicit guarantee of redress to a plaintiff is required to demonstrate a plaintiff's standing."). The requirement ensures that the plaintiff "personally would benefit in a tangible way from the court's intervention." See Warth v. Seldin, 422 U.S. 490, 508 (1975). For example, the Supreme Court has held in the context of previous environmental suits that Article III's redressability requirement was satisfied when grant of plaintiffs' sought remedy would reduce "to some extent" plaintiffs' injury. See Massachusetts v. EPA, 549 U.S. 497, 526 (2007); cf. Am. Canoe Ass'n, 326 F.3d at 520 (explaining that a plaintiff "must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged" (emphasis added) (quotation omitted)).

Plaintiffs seek a judicial declaration that defendants have violated the Clean Water Act and North Carolina's public trust doctrine and an order enjoining defendants from continuing purportedly illegal shrimp trawling activities, both of which are cognizable redress for their alleged injuries. Gaston Copper I, 204 F.3d at 162 ("A plaintiff seeking injunctive relief shows redressability by 'alleg[ing] a continuing violation or the imminence of a future violation' of the statute at issue." (quoting Steel Co., 523 U.S. at 108)); see Hewitt v. Helms, 482 U.S. 755, 761 (1987) (explaining in the context of a declaratory judgment suit that "[t]he real value of the judicial

---

[6]      For similar reasons, the court finds that, in this instance, the question of whether plaintiffs are the proper party to bring a claim under North Carolina's public trust doctrine is resolved more properly under the Rule 12(b)(6) inquiry rather than framing it in a jurisdictional cast.

14

pronouncement—what makes it a proper judicial resolution of a 'case or controversy' rather than an advisory opinion—is in the settling of some dispute which affects the behavior of the defendant towards the plaintiff"). Plaintiffs further seek cognizable redress for defendants' purported Clean Water Act violations in the form of civil penalties pursuant to 33 U.S.C. § 1365(a). Laidlaw, 528 U.S. at 185-86 ("It can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress.").

Defendants argue that the sued trawlers are only six of 435 trawlers that purportedly cause the alleged injury. They characterize the complaint as describing plaintiffs' injuries as being caused by the shrimp trawling industry in the aggregate rather than solely by these defendants. They contend this failure to sue all of those potential defendants means that any decision by this court will not provide redress to plaintiffs' alleged injury. The Supreme Court has recognized, however, that "the ability 'to effectuate a partial remedy' satisfies the redressability requirement." Uzuegbunam v. Preczewski, 141 S. Ct. 792, 801 (2021) (quoting Church of Scientology of Cal. v. United States, 506 U.S. 9, 13 (1992)); Larson v. Valente, 456 U.S. 228, 243 n.15 (1982) (explaining that a plaintiff "need not show that a favorable decision will relieve his every injury"); see, e.g., Massachusetts, 549 U.S. at 525-26 (rejecting the EPA's argument that because plaintiffs' sought-after relief would not remedy global climate change outright that they failed Article III's redressability requirement).

In sum, plaintiffs have shown that Article III jurisdiction is at least arguably proper, demonstrating and alleging injury-in-fact caused by defendants and redressable by this court.[7] Therefore, defendants' motions to dismiss for lack of subject matter jurisdiction are denied.

---

[7] Because the court concludes that, inter alia, plaintiffs Albea and Sammons, members of plaintiff Reform Group, have standing to bring the instant suit, the court does not separately consider whether plaintiff Reform Group

B.      Defendants' Motions to Dismiss for Failure to State a Claim

        1.      Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009) (quotations omitted).

        2.      Analysis

                a.      Clean Water Act Pollutant Discharge Claim

Defendants argue that plaintiffs' claim under the Clean Water Act for unlawful pollutant discharge must be dismissed because the complaint does not allege an actionable discharge of any cognizable pollutants within the meaning of the statute.

The Act prohibits "discharge of any pollutant by any person," into "navigable waters," except where permitted. 33 U.S.C. §§ 1311(a), 1362(12).[8]   The statute defines "pollutant" as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions,

---

has independent organizational standing.  See generally White Tail Park, Inc. v. Stroube, 413 F.3d 451, 458 (4th Cir. 2005) (explaining the associational standing/organizational standing distinction).

[8]      Section 1311(a) prohibits "discharge of any pollutant," except as permitted by the Environmental Protection Agency ("EPA") pursuant to § 1342.

16

chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." Id. § 1362(6).  It further defines "discharge of a pollutant" to mean "any addition of any pollutant to navigable waters from any point source."  Id. § 1362(12)(A).

This claim presents a question of statutory interpretation: does defendants' alleged casting of bycatch back into North Carolina coastal waters, including Pamlico Sound, or defendants' alleged resuspension of sediments incidental to shrimp trawling, constitute a discharge of pollutants into navigable waters?

To answer this question, the court's inquiry properly "begins with the statutory text." Nat'l Ass'n of Mfrs. v. Dep't of Def., 138 S. Ct. 617, 631 (2018) (quotation omitted); Jimenez v. Quarterman, 555 U.S. 113, 118 (2009) ("As with any question of statutory interpretation, our analysis begins with the plain language of the statute.").  "If the statutory language is unambiguous, in the absence of a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive."  Russello v. United States, 464 U.S. 16, 20 (1983).    However, ambiguity arises "[not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole." Yates v. United States, 574 U.S. 528, 537 (2015) (alterations in original) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997)).

Where there is ambiguity, the court "look[s] to legislative intent," CGM, LLC v. BellSouth Telecommunications, Inc., 664 F.3d 46, 53 (4th Cir. 2011), as demonstrated through "[t]he purpose, the subject matter, the context, [and] the legislative history . . . of the statute." Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund, 500 U.S. 72, 83, (1991) (quoting United States v. Cooper Corp., 312 U.S. 600, 605 (1941)); see, e.g., Sierra Club v. U.S. Army Corps of

17

Eng'rs, 909 F.3d 635, 645 (4th Cir. 2018) ("[W]e start with the plain language of Section 1341(d) of the Clean Water Act but also consider its structure, purpose, and legislative history as additional evidence of congressional intent."). See generally United States v. Am. Trucking Ass'ns, 310 U.S. 534, 543-44 (1940) ("When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no rule of law which forbids its use, however clear the words may appear on superficial examination." (quotations omitted)).

In the complaint, plaintiffs put forth two theories of § 1311(a)-violative conduct by defendants. First, they assert that the "unpermitted discharges of bycatch directly back into the Pamlico Sound's coastal waters . . . constitutes an illegal discharge of a pollutant" under the Clean Water Act. (Compl. ¶ 61). Second, they assert that the "disturbance, removal, and re-depositing of sediment as a result of pulling shrimp trawling equipment across the bottom of North Carolina coastal waters, including the Pamlico Sound, constitutes an illegal discharge of a pollutant" under the Act. (Id.). Both theories, however, would stretch the statute beyond its boundaries and are contrary to Congress's intent in passing the Clean Water Act.

i.     Discharge of Dredged Spoil

As noted above, § 1362(6) defines "pollutant" as including "dredged spoil." However, it does not define "dredged spoil." Dredging, in its transitive sense, is commonly defined as "collect[ing] and bring[ing] up (oysters, etc.) by means of a dredge; to bring up, fish up, or clear away or out (any object) from the bottom of a river, etc." Dredge, 4 Oxford English Dictionary (2d ed. 1989); accord Dredge, Meriam Webster's Third New International Dictionary 688 (2002) ("to catch, gather, or pull out with a dredge — often used with up"). This is in accord with the Fourth Circuit's consideration of the definition of "dredged spoil." In United States v. Deaton, the court concluded that "piles of dirt dredged up by the [defendants'] contractor were, without

18

question, 'pollutants' within the meaning of the Act." 209 F.3d 331, 334 (4th Cir. 2000). It explained that when "earth and vegetable matter from the wetland" "was removed, that material became 'dredged spoil.'" Id.

Here, accepting the complaint's factual allegations as true, defendants' shrimp trawling "disturb[s] sediments" on "the bottoms of North Carolina coastal waters." (Compl. ¶ 48). Such resuspended sediment is material brought up from the bottom of a body of water allegedly by means of a dredge, that is, the dictionary definition of dredged material. Further, this disturbed sediment, in terms of material composition, is similar to "piles of dirt," Deaton, 209 F.3d at 335, and other enumerated pollutants of "rock" and "sand" under § 1362(a)(6). Therefore, the plain meaning of dredged spoil reaches the resuspended sediments allegedly involved in defendants' conduct.

However, the Clean Water Act does not regulate, via the § 1342 permit requirement, all pollutants anywhere. Rather, it regulates "the discharge . . . . of any pollutant into 'navigable waters,'" Deaton, 209 F.3d at 334 (emphasis added), that is, the "addition" of a pollutant, 33 U.S.C. § 1362(a)(12).

In Deaton, the Fourth Circuit also considered whether dredged spoil was added to the relevant wetlands by "sidecasting." 209 F.3d at 334-35. It explained that "once material was excavated from the wetland, its redeposit in that same wetland," by "pil[ing] the excavated dirt on either side of the ditch," "added a pollutant where none had been before." Id. at 333, 335-36. The court buttressed its opinion on the "underlying rationale for defining dredged spoil as a pollutant," explaining that Congress had "determined that plain dirt, once excavated from waters of the United States, could not be redeposited into those waters without causing harm to the environment." Id.

19

at 336 (emphasis added). Congress's concern was "the <u>reintroduction</u> of these materials into the waters of the United States." <u>Id.</u> (emphasis added).

However, the conduct alleged in the complaint is distinct from the sidecasting at issue in <u>Deaton</u>. Although the sediment is described as being disturbed from the bottom of the coastal waters, it is never redeposited or reintroduced into those waters. Instead, the complaint alleges that those sediments remain in the waters. (<u>See</u> Compl. ¶ 48). Plaintiffs cannot rely on the assertion of the legal conclusion, standing alone, that the shrimp trawling discharges dredged spoil. <u>See</u> <u>Schneider v. Donaldson Funeral Home, P.A.</u>, 733 F. App'x 641, 649 (4th Cir. 2018) (rejecting the allegation that "Defendants' actions have resulted in, <u>inter alia</u>, dredged spoil, solid waste, biological materials, heat, rock, sand, cellar dirt and/or industrial, municipal, and agricultural waste being discharged into the jurisdictional waters of the United States" as "[a] 'threadbare recital[ ] of the elements of a cause of action'" (quoting <u>Iqbal</u>, 556 U.S. at 678)).

In sum, accepting that the resuspended sediment at issue is a pollutant, the complaint does not allege facts from which a reasonable inference arises that the pollutant is discharged <u>into</u> navigable waters. Plaintiff's pollutant discharge claim asserted in part on this basis thus fails as a matter of law.

        ii.      Discharge of Biological Materials

        1)     Plain Meaning

As previously noted, § 1362(6) definition of "pollutant" includes "biological materials." The statute, however, does not define that potentially broad term. Nor has the Fourth Circuit considered the exact definition of "biological materials" as used in 33 U.S.C. § 1362(6). In its literal sense, the term biological materials could reach the living and dead fish and marine species cast back into North Carolina coastal waters, as alleged in the complaint. <u>See also</u> <u>Ass'n to Protect</u>

Hammersley, Eld, & Totten Inlets v. Taylor Res., Inc., 299 F.3d 1007, 1016 (9th Cir. 2002) ("[T]he statute is ambiguous on whether 'biological materials' means all biological matter regardless of quantum and nature and regardless of whether generated by living creatures, or whether the term is limited to biological materials that are a waste product of some human process.").

Yet, the court recognizes that "overly literal reading[s] of a statute, without any regard for its context or history" that would "effect . . . [a] major . . . alteration in established legal relationships" are discouraged. See Andrus v. Charlestone Stone Prod. Co., 436 U.S. 604, 616 (1978); see, e.g., Alvord v. Comm'r, 277 F.2d 713, 719 (4th Cir. 1960) (explaining that the court has "refused to adopt a literal interpretation of [a] statute without regard to its purpose or the extraordinary result to which it would lead"). Further, "frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act." Pub. Citizen v. U.S. Dep't of Just., 491 U.S. 440, 454 (1989) (quotation omitted).

Here, the plain meaning of the term "biological materials" sheds little light on what Congress intended the Clean Water Act to regulate. See, e.g., Train v. Colo. Pub. Int. Rsch. Grp., Inc., 426 U.S. 1, 23-24 (1976) (explaining that "reliance on the 'plain meaning' of the words 'radioactive materials' contained in the definition of 'pollutant' in the [Act] contributes little to our understanding of whether Congress intended the Act to encompass the regulation of source, byproduct, and special nuclear materials"). The potential breadth of the term "biological materials" alone breeds ambiguity. See, e.g., Kentuckians for Commonwealth Inc. v. Rivenburgh, 317 F.3d 425, 441 (4th Cir. 2003) ("Because the Clean Water does not define 'fill material,' nor

does it suggest on its face the limitation of 'fill material' found by the district court, the statute is silent on the issue before us, and such silence 'normally creates ambiguity. It does not resolve it.'" (quoting Barnhart v. Walton, 535 U.S. 212, 218 (2002))).  Accordingly, the court turns, first, to the "statutory context" of the term at issue for clarification of congressional intent.  See, e.g., Util. Air Regul. Grp. v. EPA, 573 U.S. 302, 321 (2014) ("[R]easonable statutory interpretation must account for both the specific context in which . . . language is used and the broader context of the statute as a whole." (quotation omitted)); Orquera v. Ashcroft, 357 F.3d 413, 420 (4th Cir. 2003) ("Confronted with two plausible readings of [a statutory section], [the court] examine[s] the statutory text in its broader context to discern whether an interpretation of that text 'makes sense of the statutory scheme as a whole.'" (quoting Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 487 (1999))).

2)      Statutory Context

In broad terms, the Clean Water Act provides that its "objective . . . is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," which is to be accomplished, inter alia, through "the national goal that wherever attainable, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife . . . be achieved." 33 U.S.C. § 1251(a); see also Kentuckians for Commonwealth, 317 F.3d at 447 (looking to "[t]he stated goal" of the Act to determine whether a particular statutory interpretation "was . . . a permissible reading" of the statute).  However, the Clean Water Act states more specifically that "[e]xcept as expressly provided in [the Clean Water Act], nothing in [the Act] shall . . . be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States." 33 U.S.C. § 1370; see also United States v. Homestake Min. Co., 595 F.2d 421, 429 (8th Cir. 1979) (describing, inter alia, §

22

1370 as providing the "context of the vigorous federalism underlying" the Clean Water Act); cf. Sierra Club, 909 F.3d at 647 (looking at "Congress's express purpose in enacting" the Act and specific statutory sections, including state-deferential policy statements and states' rights savings clauses, to interpret the Act's text).

Therefore, the Clean Water Act's use of "biological material" must be read in the context of § 1370's requirement of state-rights-conscientious constructions of the Act. See, e.g., King v. Burwell, 576 U.S. 473, 492 (2015) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." (omission in original) (internal quotation marks omitted) (quoting United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371 (1988))).

Federally, management of fisheries within state coastal waters has been recognized as squarely within that state's rights and jurisdiction. See, e.g., Reaffirmation of State Regulation of Resident and Nonresident Hunting and Fishing Act of 2005, Pub. L. No. 109-13, § 6035(b)(1), 119 Stat. 289, 289-90 ("It is the policy of Congress that it is in the public interest for each State to continue to regulate the taking for any purpose of fish and wildlife within its boundaries . . . ."); 16 U.S.C. §§ 742i(1) ("Nothing in [the Fish and Wildlife Act of 1956] shall be construed . . . to supersede any regulatory authority over fisheries exercised by the States either individually or under interstate compacts . . . ."), 1856(a) ("[N]othing in [Magnuson-Stevens Fishery Conservation and Management Act] shall be construed as . . . diminishing the jurisdiction or authority of any State within its boundaries[,] . . . [which] extend[s] . . . to any pocket of waters that is adjacent to the State and totally enclosed by lines delimiting the territorial sea of the United States . . . ."); 43

23

U.S.C. § 1311(a) ("[T]he right and power to manage . . . natural resources . . . [is] vested in and assigned to the respective states . . . .").

Management of fisheries includes fishing of those fisheries, which, for practical purposes, implicates bycatch and bycatch mortality. 142 Cong. Rec. H11397 (daily ed. Sept. 27, 1997) (statement of Rep. Don Young) ("Both bodies recognize that bycatch can occur in any fishery, and that complete avoidance of mortality is impossible . . . ."); see also 16 U.S.C. §§ 1802(2) ("The term 'bycatch' means fish which are harvested in a fishery, but which are not sold or kept for personal use, and includes economic discards and regulatory discards."), 1851(a)(9) ("Conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch." (emphasis added)); U.S. Env't Prot. Agency, Reviewing Environmental Impact Statements for Fishery Management Plans 51 (Sept. 2005) (explaining that "[b]ycatch is not a new issue or problem. It has existed since fishing began and virtually all fisheries in the world have some bycatch associated with them" and that "bycatch and discards add to fishing mortality and should be considered a direct effect of fishing"); N.C. Div. of Marine Fisheries, 2020 Fishery Management Plan Review 18, 74 (Aug. 2021) (enumerating the objective regarding a number of marine species of "[p]romot[ing] practices that minimize bycatch and discard mortality").

Accordingly, an interpretation of the Clean Water Act's prohibition of unpermitted discharge of biological materials into navigable waters as applying to bycatch and its inherent discard as caused by fishing in North Carolina coastal waters would extend the Act into an area of traditional state management and jurisdiction. Cf. County of Maui v. Hawaii Wildlife Fund, 140 S. Ct. 1462, 1471 (2020) (recognizing, as pertinent to the statutory construction of the Clean Water Act, the impact on areas of regulation that "Congress intended to leave substantial responsibility

24

and autonomy to the States").  This would contravene the statute's explicit guidance that nothing in the Act be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to their boundary waters.

Moreover, apart from the Act's explicit direction to not construe its terms to infringe on traditional state jurisdiction over state coastal waters, the Supreme Court has cautioned against interpretations of the statute that would "result in a significant impingement of the States' traditional and primary power" over certain regulatory areas.  See Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs, 531 U.S. 159, 174 (2001).  The Court has explained that "[w]e ordinarily expect a 'clear and manifest' statement from Congress to authorize an unprecedented intrusion into traditional state authority."  Rapanos v. United States, 547 U.S. 715, 738 (2006) (plurality opinion); see, e.g., Yates, 574 U.S. at 540 ("If Congress indeed meant to make § 1519 an all-encompassing ban on the spoliation of evidence, as the dissent believes Congress did, one would have expected a clearer indication of that intent.").

Here, the court is presented with the contrary: a clear and manifest statement from Congress to not construe its words as affecting the rights of the States with respect to their waters, which is exactly what plaintiffs' requested construction would do.  See Russello, 464 U.S. at 20 (explaining that unambiguous statutory text, which "ordinarily [must] be regarded as conclusive," may require alternative interpretation in light of "a clearly expressed legislative intent to the contrary"); Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571 (1982) ("[I]n rare cases the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters . . . .").  Further, the court declines to treat bycatch carrion as a federally cognizable pollutant because it would "effect . . . [a] major . . . alteration in established legal relationships based on nothing more than

an overly literal reading of a statute, without any regard for its context or history." See Andrus, 436 U.S. at 616.

This alone guides against construing 33 U.S.C. §§ 1311(a) to cover the challenged conduct and, therefore, allowing plaintiffs' claim to proceed. Further, as detailed below, not only is fishery management in state coastal waters, inclusive of bycatch and discard, traditionally a state concern, where such or similar activity is regulated federally and in North Carolina, it is controlled by far more specific provisions than the Clean Water Act's broad and general prohibition on unpermitted discharge of certain materials.

### 3) Lex Specialis

"It is a commonplace of statutory construction that the specific governs the general." Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384 (1992); see also In re Anheuser-Busch Beer Labeling Mktg. & Sales Pracs. Litig., 644 F. App'x 515, 531 (6th Cir. 2016) (describing Morales as an application of the statutory cannon of lex specialis derogat legi generali). This canon serves "as a warning against applying a general provision when doing so would undermine limitations created by a more specific provision." Varity Corp. v. Howe, 516 U.S. 489, 511 (1996). Accordingly, unless "there is . . . clear intention otherwise," the court will not construe "a specific statute" to "be controlled or nullified by a general one, regardless of the priority of enactment." See Morton v. Mancari, 417 U.S. 535, 550-51 (1974). Further, "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 468 (2001).

There is extensive federal regulation of fisheries, specifically through the Magnuson-Stevens Fishery Conservation and Management Act of 1976 ("Magnuson-Stevens Act"). See, e.g.,

26

16 U.S.C. § 1811; see also 16 USC § 724f(a) (Fish and Wildlife Improvement Act of 1978). As noted above, where not regulated by the federal government, e.g., within state coastal waters, management authority is expressly vested with the States. See, e.g., 16 U.S.C. §§ 742i ("Nothing in [the Fish and Wildlife Act of 1956] shall be construed . . . to supersede any regulatory authority over fisheries exercised by the States either individually or under interstate compacts . . . ."), 1221 (enumerating Estuarine Areas Act's declaration that "[i]n connection with the exercise of jurisdiction over the estuaries of the Nation and in consequence of the benefits resulting to the public, it is declared to be the policy of Congress to recognize, preserve, and protect the responsibilities of the States in protecting, conserving, and restoring the estuaries in the United States."), 1856(a) ("[N]othing in [Magnuson-Stevens Act] shall be construed as . . . diminishing the jurisdiction or authority of any State within its boundaries[,] . . . [which] extend[s] . . . to any pocket of waters that is adjacent to the State and totally enclosed by lines delimiting the territorial sea of the United States . . . ."), 5101 (explaining that "[i]ncreased fishing pressure, environmental pollution, and the loss and alteration of habitat have reduced severely certain Atlantic coastal fishery resources" and that "[t]he responsibility for managing Atlantic coastal fisheries rests with the States"); 43 U.S.C. § 1311(a) ("[T]he right and power to manage . . . natural resources . . . [is] vested in and assigned to the respective states . . . .").

Federal regulation of fisheries and management of fishery resources include specific provisions regarding bycatch. For example, the Magnuson-Stevens Act, which creates fishery management councils and tasks them with crafting fishery management plans consistent with the standards announced therein, 16 U.S.C. §§ 1801(b)(5), 1851, 1853, specifically, guides that "[c]onservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch." Id. §

1851(a)(9); <u>see also</u> <u>id.</u> § 1865(a) (requiring establishment of a bycatch reduction program); 50 C.F.R. §§ 600.350(d) ("The priority under this standard is first to avoid catching bycatch species where practicable. <u>Fish that are bycatch and cannot be avoided must, to the extent practicable, be returned to the sea alive</u>." (emphasis added)), 622.207, 622.53.    The legislative history of the Sustainable Fisheries Act, which amended the Magnuson-Stevens Act in 1997 to add the language regarding the minimization of bycatch, <u>see</u> Sustainable Fisheries Act, Pub. L. No. 104-297, § 106, 110 Stat. 3559, 3570 (Oct. 11, 1996) (codified as amended at 16 U.S.C. § 1851(a)(9)), reveals that, in reference to this text:

> The use of the term 'to the extent practicable' was chosen deliberately by both the Sentence and the House. Both bodies recognize that bycatch can occur in any fishery, and that complete avoidance of mortality is impossible . . . . However, it I not the intent of Congress that the councils ban a type of fishing gear or a type of fishing in order to comply with this standard.

142 Cong. Rec. H11397 (daily ed. Sept. 27, 1997) (statement of Rep. Don Young).  Not only do these federal regulations require a reduction in bycatch, but some also require that certain animals if caught as bycatch be released back into the water.  <u>See, e.g.</u>, 50 C.F.R. §§ 600.350(d) ("Fish that are bycatch and cannot be avoided must, to the extent practicable, be returned to the sea alive."), 635.22(c)(5) (explaining that certain sharks "must be released by persons aboard a vessel that has not been issued a Federal Atlantic commercial shark vessel permit"), 635.26(a)(1) (explaining that "[a]ll [bluefin tuna] caught under the catch-and-release or tag-and-release programs must be returned to the sea immediately with a minimum of injury").

Similarly, North Carolina, through its federally recognized right to regulate fisheries within its waters, regulates bycatch.  15A N.C. Admin. Code 3J.0104(d), (f) (regulating the use of trawl nets and allowing the requirement of bycatch reduction devices related to the taking of blue crab incidental to shrimp trawling); N.C. Div. of Marine Fisheries, N.C. Dep't of Env't Quality, SH-3-2019, <u>Proclamation Re: Shrimp Trawl Bycatch Reduction Device Requirements – Pamlico Sound</u>

and Portions of the Pamlico Bay and Neuse Rivers (2019) (requiring use of bycatch reduction devices that reportedly achieved at least 40% finfish bycatch reduction); N.C. Div. of Marine Fisheries, N.C. Dep't of Env't Quality, FF-55-2012, Proclamation Re: Weakfish Commercial Fishing Operations (implementing a bycatch limit of 100 pounds of weakfish (12 inches or more in total length) taken with a shrimp trawl and requiring that the weight of weakfish not exceed 50% of the total weight of the combined catch). Again, just as federal law does, North Carolina law requires that certain fish be returned to the water if caught, without mention of the marine life's liveliness. See 15A N.C. Admin. Code 3M.0102(a) ("It shall be unlawful to land finfish, taken in connection with a commercial fishing operation, that are unmarketable as individual finfish by reason of size . . . .").

Given the above regulatory framework, it is unlikely that, despite enactment of § 1311(a) and § 1362(6) in 1972,[9] Congress would then later implement a complex statutory scheme to manage and conserve fisheries, which specifically recognizes that bycatch and the mortality of bycatch should be minimized and only to the extent practicable, if § 1311(a) did indeed prohibit, outright, the unpermitted discharge of bycatch and bycatch carrion. Rather, an interpretation of the Clean Water Act to ban all bycatch discard from a fishing vessel would be in tension with the Magnuson-Stevens Act's specific directive to Regional Fishery Management Councils to prepare plans for fisheries conversation that only minimize bycatch and bycatch mortality. See, e.g., Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 666 (2007) (explaining that statutory language "must . . . [be] read . . . against the statutory backdrop of the many mandatory agency directives whose operation it would implicitly abrogate or repeal if it were construed as broadly as" proposed). Moreover, such an interpretation of § 1311 to "have included these materials . . .

---

[9]     See Federal Water Pollution Control Act Amendments of 1972, Pub. L. No. 92-500, sec. 2, §§ 301, 502, 86 Stat. 816, 844, 886.

29

would . . . mark[] a significant alteration of the pervasive regulatory scheme embodied in the" Magnuson-Stevens Act.  See Train, 426 U.S. at 24.

Plaintiffs argue that their construction of the Clean Water Act to reach bycatch and bycatch discard does not implicate fisheries management, arguing that "this is not a fisheries management case." (Pls.' 12(b)(6) Resp. (DE 47) at 7).  Their assertion is belied by their initially suing the North Carolina Division of Marine Fisheries for "failing to adequately regulate Defendant Trawling Companies' shrimp trawling operations and allowing them to degrade and diminish North Carolina coastal waters' fisheries." (Compl. ¶ 79 (emphasis added)).  Further, the regulatory bodies in charge of fisheries management appear to universally treat bycatch as a fisheries management issue.  See, e.g., 50 C.F.R. § 600.350(d) ("The priority . . . is first to avoid catching bycatch species where practicable. Fish that are bycatch and cannot be avoided must, to the extent practicable, be returned to the sea alive."); 15A N.C. Admin. Code 3H.0103.(b) (enumerating the scope of DMF's Director's proclamation authority to include "bycatch issues").  In fact, the Magnuson-Stevens Act explicitly recognizes that some portion of bycatch will need to be discarded for regulatory reasons.  See 16 U.S.C. § 1802(2) ("The term 'bycatch' means fish which are harvested in a fishery, but which are not sold or kept for personal use, and includes economic discards and regulatory discards." (emphasis added)), (38) ("The term 'regulatory discards' means fish harvested in a fishery which fishermen are required by regulation to discard whenever caught, or are required by regulation to retain but not sell."); see also 50 C.F.R. § 600.350(d) ("Fish that are bycatch and cannot be avoided must, to the extent practicable, be returned to the sea alive.").

Moreover, it does not appear that the EPA has ever understood its statutory authority to reach bycatch or discharge of bycatch carrion more specifically.  See, e.g., U.S. Env't Prot. Agency, supra, at 30-33 (failing to describe as part of its interaction with fishery management

30

plans any permits required for bycatch discharge); see also id. at 51-53 (failing to mention any potential permitting required as part of its summary of bycatch issues). Although not dispositive, plaintiffs do not point to any case where a court has interpreted the Clean Water Act to cover this type of conduct, despite bycatch and bycatch discard "exist[ing] since fishing began." Id. at 51. Finally, the EPA has acknowledged that bycatch is problematic for its impact on fisheries. See id. at 52 ("The quantity of fish killed as bycatch is a significant factor for many stocks. Evidence suggests that these levels of mortality are unsustainable and that we are above the maximum sustainable level of many fisheries' biological productivity"), 52 ("[T]he primary bycatch or discard concern pertains to discards associated with the harvesting of finfish . . . ."). By contrast, it has not described the problem as one within its Clean Water Act regulatory ambit. See id. at 30-33, 75 (noting that sea turtle bycatch would be regulated under the Endangered Species Act).

Accordingly, contrary to plaintiffs' argument, the crux of the issue is not that defendants cannot be regulated by both the Clean Water Act and statutory or regulatory schemes concerning fisheries management. Rather, the issue is that plaintiffs' reliance on the Act's general terms as creating a prohibition on casting bycatch back into navigable waters is in tension with more specific regulatory provisions contemplating the realities of bycatch, related mortality, and discard and, in certain parts, expressly requiring what plaintiffs would prohibit. The fact that plaintiffs' interpretation of the Clean Water Act would require that more general statute to regulate subject matter that other more specific federal and state statutes govern and, in places, nullify those more specific provisions counsels against that interpretation.

The absurdity resulting from the construction of biological materials for which plaintiffs advocate is not restricted to Congress banning a practice and then, without reference to the prior

ban, specifically recognizing the current impracticality of such a ban. Rather, this and other absurd results, discussed below, further counsel against plaintiffs' interpretation.

4)    Absurd Results

Courts may "venture beyond the plain meaning of the statute," inter alia, when "literal application of the statute would produce an absurd result." Holland v. Big River Mins. Corp., 181 F.3d 597, 603 n.2 (4th Cir. 1999); see also Griffin, 458 U.S. at 575 (explaining that "interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available"). "However, a statutory interpretation that produces surprising or anomalous results is not the same as one producing absurd results." Lara-Aguilar v. Sessions, 889 F.3d 134, 144 (4th Cir. 2018) (explaining that "to truly be characterized as absurd, the interpretation of a statute must result in an outcome that is so gross as to shock the general moral or common sense." (quotation omitted)). "Thus, an interpretation of a statute that produces 'plausible' results cannot violate the absurd-result rule of statutory construction." Id.

Here, the absurd results fostered by plaintiffs' construction of the Act further counsels against its acceptance. Plaintiffs assert that the Clean Water Act prohibits defendants from casting bycatch and bycatch carrion back into North Carolina coastal waters. Yet, per this interpretation of the Act, for example, any person on a dinghy[10] off of Ocracoke Island who picks up a floating crab out of the water and, moments later, places it back in the water after that person has satisfied his or her curiosity commits a literal violation of § 1311(a) due to his or her failure to first obtain a permit to discharge such a pollutant back into navigable waters. See, e.g., Hughey v. JMS Dev. Corp., 78 F.3d 1523, 1529-30 (11th Cir. 1996) (holding it would be absurd to apply the Clean Water Act's requirement of "zero discharge" to de minimis pollution discharges that posed no

---

[10]    The Clean Water Act's definition of a "point source" includes "any discernible, confined and discrete conveyance, including but not limited to any . . . vessel or floating craft." 33 U.S.S. § 1362(14).

32

threat to public health).   Plaintiffs' interpretation would transform § 1311(a) into a sweeping source of litigation that Congress could not have intended, given that any individual recreating at a regulated body of water could bring a Clean Water Act citizen suit against a neighbor, with the threat of civil penalties, for the neighbor's casting of an accidentally caught and killed guppy back into the waters from his or her dinghy.

Plaintiffs dismiss this argument as "silly," asserting that the Supreme Court in County of Maui mitigated any such concern because, here and there, "both the EPA and state permitting agencies have proven themselves capable of developing appropriate rules and guidance to avoid overburdensome regulation." (Pls.' 12(b)(6) Resp. (DE 47) at 14 (citing County of Maui, 140 S. Ct. at 1477)).   But County of Maui did not create an enacting-administrative-agency exception to the rule of statutory interpretation regarding absurd results.   Moreover, the instant context into which plaintiffs seek to thrust the regulatory strictures of the Act is not one that the "EPA has applied the permitting provision to some (but not to all) discharges . . . for over 30 years," during which there has been "no evidence of unmanageable expansion." County of Maui, 140 S. Ct. at 1477.

Here, there is no evidence of historical practice by the EPA or another administrative agency that could assuage the court regarding possible unmanageable expansion.   The factual context of potentially impacted fishers is more diverse and expansive than could practically be mitigated by a "general permit for recurring situations."   Id.   And finally, plaintiffs' construction would not only reach absurd results, but absurd results infringing on traditionally state-regulated subjects.

Although the Fourth Circuit has not considered the exact definition of "biological materials" as used in 33 U.S.C. § 1362(6), other circuits have considered the scope of the term and what kinds of "discharge" of such a pollutant are statutorily covered.  See generally Dolan v. U.S. Postal Serv., 546 U.S. 481, 486 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." (emphasis added)).   Both parties refer to these cases as resolving the instant matter.  For the reasons discussed below, the court disagrees.

For example, plaintiffs cite National Wildlife Federation v. Consumers Power Co. for the proposition that "federal courts have . . . confirm[ed] that 'biological material' . . . encompass[es] dead fish discharged into the water." (Pls.' 12(b)(6) Resp. (DE 47) at 10 (citing Nat'l Wildlife Fed'n v. Consumers Power Co., 862 F.2d 580, 586 (6th Cir. 1988))).

The Sixth Circuit in Consumers Power considered a defendant's hydroelectric dam operation that pulled water, and incidental fish, from Lake Michigan, ran both through the power-generating turbines, and then returned both to Lake Michigan, with some fish the worse for wear. 862 F.2d 580, 581-82 (6th Cir. 1988).  The court noted without further analysis that the "[m]illions of pounds of live fish, dead fish and fish remains annually discharged into Lake Michigan by the Ludington facility are pollutants within the meaning of the [Act], since they are 'biological materials.'"  Id. at 583.

Consumers Power relied on the Ninth Circuit's opinion in Association of Pacific Fisheries v. EPA to support its conclusory assertion that "live fish . . . are pollutants." Consumers Power, 862 at 583 (citing 615 F.2d 794, 809 (9th Cir. 1980)). The Ninth Circuit's later opinion in Association to Protect Hammersley, Eld, & Totten Inlets v. Taylor Resources, Inc., 299 F.3d 1007,

1017 (9th Cir. 2002) (hereinafter <u>Taylor</u>), however, counsels that <u>Association of Pacific Fisheries</u> should be read in a more limited fashion. <u>Taylor</u> explained that the Clean Water Act's use of specific terms "such as 'radioactive materials,' 'wrecked or discarded equipment,' 'garbage,' 'sewage sludge,' 'solid waste,' and 'incinerator residue' support[s] an understanding of the more general statutory term, 'biological materials,' as <u>waste material of a human or industrial process</u>." <u>Id.</u> (emphasis added). The court reasoned that "materials, although naturally occurring, [that] are altered by a human or industrial process and[] as waste material in significant amounts[] might affect the biological composition of the water" may constitute pollutants. <u>Id.</u> at 1017. The focus, the Ninth Circuit explained, is whether "the materials . . . are transformed by human activity," and in that case, "the shells and natural byproduct of living mussels released from [defendant's] facilities [were] the result of the natural biological processes of the mussels." <u>Id.</u>

Moreover, <u>Consumers Power</u> ultimately concluded that no discharge of a pollutant took place because "[a]ny water quality change resulting from the release of entrained fish at the Ludington facility [was] simply not . . . from the physical introduction of a pollutant from the outside world." 862 F.2d at 585-86 (deferring to the EPA's definition of "addition" of a pollutant). It further recognized that its broad definition of biological materials to include live fish, in fact, counseled against finding that an addition of pollutants had taken place in that case. <u>See id.</u> at 585 ("If the district court decision were upheld, a § 402 permit would be required even for a dam which released alive all fish passing through it from and into waters of the United States, since the [Clean Water Act] does not distinguish between living and dead 'biological materials.'").

Therefore, <u>Consumers Power</u> and <u>Taylor</u> do not, even as persuasive authority, resolve the question before the court. Under <u>Taylor</u>'s definition, the still-living fish and marine species bycatch cast back into the coastal waters would not constitute biological materials at all given that

35

they had not been "transformed by human activity" or "altered by industrial process." 299 F.3d at 1016-17. And under <u>Consumers Power</u>, when bycatch carrion is cast back into the ocean, it is not a pollutant from "the outside world" and therefore not an "addition" as required for a "discharge." <u>See</u> 862 F.2d at 585-86.

Plaintiffs argues that, while the court should adopt <u>Consumers Power</u>'s broad definition of biological materials, it should apply <u>Deaton</u>'s analysis of discharge insofar as that analysis disagrees with or distinguishes <u>Consumer Power</u>'s comparable analysis. (<u>See</u> Pls. 12(b)(6) Resp. (DE 47) at 18). <u>Deaton</u> explained that material already present in navigable waters can be considered a discharge if reintroduced "when an activity transforms some material from a nonpollutant into a pollutant." <u>See</u> 209 F.3d at 335; <u>cf.</u> <u>Taylor</u>, 299 F.3d at 1016-17 (looking to whether putative biological materials were "transformed by human activity" or "altered by industrial process" as would make them pollutants). <u>See generally</u> 40 C.F.R. § 401.11(g) ("The term pollution means the <u>man-made or man induced alteration</u> of the chemical, physical, biological and radiological integrity of water." (emphasis added)). The court in <u>Deaton</u> focused on the fact that dredged spoil's "redeposit in that same wetland added a pollutant <u>where none had been before</u>." <u>See</u> 209 F.3d at 335-36 (emphasis added); <u>cf.</u> <u>Consumers Power</u>, 862 F.2d at 585 (explaining that "no pollutant [is] introduced from the outside world because any entrained fish released with the Ludington facility's turbine generating water <u>originate in Lake Michigan, and do not enter the Lake from the outside world</u>" (emphasis added)). At the heart of its analysis, <u>Deaton</u> recognized that conduct that introduces a "statutory pollutant and <u>a type</u> of material that up until then was not present" constitutes an addition. <u>See</u> 209 F.3d at 335 (emphasis added).

Under <u>Deaton</u>, if shrimp trawling is analogous to sidecasting and the transformation of "earth and vegetable matter," via piling the excavated material on either side of a ditch, into

36

"dredged spoil" is akin to the transformation of living fish and marine species, via incidental taking during shrimp trawling, into carrion, the Clean Water Act arguably requires a permit for the return of bycatch carrion into coastal waters. If, on the other hand, under <u>Deaton</u>, the effluent of which plaintiff complains, bycatch discard as biological materials, is a type of material that was already "present" before the alleged discharge, (e.g., naturally occurring live and dead fish and marine species), this is not an instance where material is added where "none had been before," and <u>Deaton</u>'s discharge is not analogous.

Accordingly, reference to caselaw presents two plausible applications of the Act's prohibition on unpermitted discharge of biological materials into navigable waters. Yet, reference to the context of §§ 1311 and 1362, indicia of congressional intent, and canons of statutory interpretation all indicate that any construction of the Clean Water Act's prohibition on unpermitted discharge of biological materials should not reach casting bycatch (live or dead) back into North Carolina coastal waters. <u>See, e.g.</u>, <u>Orquera</u>, 357 F.3d at 420 ("Confronted with two plausible readings of [a statutory section], [the court] examine[s] the statutory text in its broader context to discern whether an interpretation of that text 'makes sense of the statutory scheme as a whole.'" (quoting <u>Am.-Arab Anti-Discrimination Comm.</u>, 525 U.S. at 487)). In light of this clear and convincing evidence to the contrary and the lack of controlling Fourth Circuit precedent on the issue, the court does not adopt plaintiffs' proffered construction of biological materials.

In sum, neither of plaintiffs' theories of Clean Water Act pollutant discharge as alleged in the complaint are actionable. Accordingly, plaintiffs fail to state a pollutant discharge claim upon which relief may be granted. The court thus dismisses that part of their claim under the Act's allowance of citizen suits, 33 U.S.C. § 1365, where it is based on an alleged § 1311(a) violation by defendants.

37

b.     Clean Water Act Dredged Material Claim

Defendants argue that the remaining part of plaintiffs' Clean Water Act claim premised upon dredged materials must be dismissed because the complaint alleges de minimis conduct that does not require a § 1344 permit.

Barring certain exceptions, the Act requires a permit from the U.S. Army Corps of Engineers, or an approved state program, to "discharge . . . dredged or fill material into the navigable waters," and even then, discharge is only allowed "at specified disposal sites." 33 U.S.C. § 1344.  Regulations promulgated by the Corps of Engineers define "dredged material" to mean "material that is excavated or dredged from the waters of the United States."   33 C.F.R. § 323.2(c).[11] Although "the term discharge of dredged materials means any addition of dredged material into, including redeposit of dredged material, . . . the Waters of the United States," that term "does not include . . . [i]ncidental fallback."  Id. § 323.2(d).

More specifically, "Section 404 authorization is not required for . . . [a]ny incidental addition, including redeposit, of dredged material associated with any activity that does not have or would not have the effect of destroying or degrading an area of waters." Id. § 323.2(d)(3)(i).  In pertinent part, the regulations explain that "an activity associated with a discharge of dredged material degrades an area of waters of the United States if it has more than a de minimis (i.e., inconsequential) effect on the area by causing an identifiable individual or cumulative adverse effect on any aquatic function."  33 C.F.R. § 323.2(d)(5).

---

[11]      Similarly, regulations state that "[d]redged materials are bottom sediments or materials that have been dredged or excavated from the navigable waters of the United States, and their disposal into ocean waters is regulated by the U.S. Army Corps of Engineers. Dredged material consists primarily of natural sediments or materials which may be contaminated by municipal or industrial wastes or by runoff from terrestrial sources such as agricultural lands." 40 C.F.R. § 277.13(a).

This rule is in accord with congressional intent underlying § 1344, under which "Congress understood 'discharge of dredged material' to mean open water disposal of material removed during the digging or deepening of navigable waterways." Am. Min. Cong. v. U.S. Army Corps of Eng'rs, 951 F. Supp. 267, 273 (D.D.C. 1997) (gathering legislative history), aff'd sub nom. Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs, 145 F.3d 1399 (D.C. Cir. 1998).

Here, the complaint alleges what is, in effect, incidental fallback or addition. The sediment disturbed by defendants' shrimp trawling resuspends that purportedly dredged material into navigable waters.[12] But the complaint does not allege that, beyond conclusory statements, the discharge has the effect of destroying or degrading an area. (See, e.g., Compl. ¶¶ 48 ("Shrimp trawling operations . . . disturb sediments, causing those sediments to become re-suspended in the water), 51 ("[S]hrimp trawling activities result in the bottoms of . . . fisheries being dredged, . . . re-suspending sediments that pollute coastal waters . . . ."), 51 ("[S]hrimp trawling activities pollute and degrade North Carolina's marine and estuarine environments."). Such assertions constitute recitation of elements of a cause of action and bare assertions devoid of further factual enhancement, which the court may not credit at this stage. The complaint lacks the requisite factual matter to raise defendants' destruction or degradation of an area by the alleged discharge of dredged material beyond a speculative level.

Plaintiffs' point towards their later filed exhibits as demonstrating that defendants do not cause incidental fallback or addition. However, in resolving defendants' motions to dismiss for

_____

[12]     To the extent plaintiffs allege that the "dragging otter trawls . . . along the bottoms of North Carolina coastal waters[] damage[s] the habitats of bottom-dwelling species," (Compl. ¶ 48; see also id. ¶ 51 (alleging that defendants' "shrimp trawling activities result in the bottoms of ecologically- and commercially-important fisheries being dredged, thereby harming fish and marine species by destroying habitats")), that challenged conduct consists of actual dredging. Dredging, itself, is not regulated under § 1344 permits but rather 33 U.S.C. § 403, Section 10 of the Rivers and Harbors Act of 1899, see, e.g., AES Sparrows Point LNG v. Wilson, 589 F.3d 721, 724 (4th Cir. 2009) ("The Army Corps of Engineers . . . issues authorizations pursuant to . . . § 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, to conduct dredging in navigable waters of the United States . . . ."), which is unmentioned in plaintiffs' complaint.

failure to state a claim, the court may do so only by reference to "documents that are explicitly incorporated into the complaint by reference," "those attached to the complaint as exhibits," and documents that are attached to motions to dismiss if those documents are "integral to the complaint and [about which] there is no dispute about the document's authenticity." See Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016). In contesting a Rule 12(b)(6) motion, a plaintiff "cannot cure pleading deficiencies in the . . . complaint with later-filed supporting documentation" such as "supplemental affidavit[s] with attachments." United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc., 707 F.3d 451, 459 n.8 (4th Cir. 2013).

Plaintiffs also rely on Deaton's holding regarding sidecasting to argue that defendants' activities, as alleged, do not involve incidental fallback. (See Pls.' 12(b)(6) Resp. (DE 47) at 21). However, Deaton considered an alleged § 1311 violation of discharge of a pollutant rather than § 1344's discharge of dredged material, which is controlled by a separate permitting process. See Coeur Alaska, Inc. v. Se. Alaska Conservation Council, 557 U.S. 261, 274 (2009) ("The Act is best understood to provide that if the Corps has authority to issue a permit for a discharge under § 404, then the EPA lacks authority to do so under § 402."). Nor did Deaton consider application of 33 C.F.R. § 323.2. See also Deaton, 209 F.3d at 337 (recognizing a distinction between incidental fallback and sidecasting (citing Nat'l Min. Ass'n, 145 F.3d at 1404)).

In sum, plaintiffs have not alleged sufficient factual matter from which the court can reasonably infer that defendants engage or have engaged in discharge of dredged material requiring a permit under § 1344. Therefore, they fail to state a claim premised on that alleged violation by defendants.

        c.     North Carolina Public Trust Doctrine Claims

The North Carolina Constitution states that

> [i]t shall be the policy of this State to conserve and protect its lands and waters for the benefit of all its citizenry, and to this end it shall be a proper function of the State of North Carolina and its political subdivisions . . . to control and limit the pollution of our . . . water.

N.C. Const. art. XIV, § 5. Similarly, section 113-131 of the North Carolina General Statutes states that "[t]he marine and estuarine and wildlife resources of the State belong to the people of the State as a whole" and empowers certain state agencies to initiate contested administrative case proceedings and civil actions where "public trust rights of the people of the State" are adversely affected, encroached upon, or otherwise violated. N.C. Gen. Stat. § 113-131; see also Fabrikant v. Currituck County, 174 N.C. App. 30, 41 (2005) ("The public trust doctrine is a common law principle providing that certain land associated with bodies of water is held in trust by the State for the benefit of the public.").

However, the authority to sue for violations of this public trust doctrine is strictly limited. For example, "North Carolina law is clear that [a municipality] has no authority to enforce the public trust doctrine." Town of Nags Head v. Toloczko, 728 F.3d 391, 397 (4th Cir. 2013) (citing Town of Nags Head v. Cherry, Inc., 219 N.C. App. 66, 74 (2012)). Instead, "the only body which can affirmatively bring an action to assert rights under the public trust doctrine" is "the State" through its Attorney General. Cherry, 219 N.C. App. at 74-75; Fabrikant, 174 N.C. App. at 41-42.

Here, plaintiffs, on the facts alleged in the complaint, are not authorized to bring suit for violations of the public trust doctrine, as they are not the Attorney General or even acting on behalf of the State. Accordingly, those claims must be dismissed.

41

C.      Plaintiffs' Motion to Amend

Plaintiffs seek leave to file an amended complaint that would remove allegations regarding now-dismissed defendant North Carolina Department of Environmental Quality, Division of Marine Fisheries, and add Williams as a defendant.

1.      Standard of Review

Rule 15 of the Federal Rules of Civil Procedure guides that, in this context, "a party may amend its pleading only with the opposing party's written consent or the court's leave," but that "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2); see also Hinson v. Norwest Fin. S.C., Inc., 239 F.3d 611, 618 (4th Cir. 2001) ("[A] court determining whether to grant a motion to amend to join additional [parties] must consider both the general principles of amendment provided by Rule 15(a) and also the more specific joinder provisions of Rule 20(a)."). The court may deny a motion for leave to amend "when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." Johnson v. Oroweat Foods Co., 785 F.2d 503, 509 (4th Cir. 1986). A proposed amendment is futile when it "is clearly insufficient or frivolous on its face." Id. at 510. "A proposed amendment is also futile if the claim it presents would not survive a motion to dismiss." Save Our Sound OBX, Inc. v. N.C. Dep't of Transp., 914 F.3d 213, 228 (4th Cir. 2019).

2.      Analysis

Here, plaintiffs' amendment is futile. The addition of Williams as a defendant is not joined by any additional, substantive factual allegations regarding his conduct. (See Pls.' Mem. (DE 59) at 2 (stating that plaintiffs' "proposed amended complaint corrects statements regarding ownership of the trawling vessel Blackbeard, but does not make any changes to the substance" of plaintiffs' Clean Water Act claims)). Therefore, for the same reasons, discussed above, that plaintiffs'

42

complaint fails to state a claim against instant defendants, so, too, would the proposed amended claim against Williams fail. The court denies plaintiffs' motion for leave to file an amended complaint.

## CONCLUSION

Based on the foregoing, defendants' motions to dismiss for lack of subject matter jurisdiction are DENIED. However, their motions to dismiss for failure to state a claim are GRANTED. Plaintiffs' claims are DISMISSED. Plaintiffs' motion for leave to amend their complaint and defendants' motions to strike certain filings of plaintiffs are DENIED. The clerk is DIRECTED to close this case.

SO ORDERED, this the 17th day of September, 2021.


LOUISE W. FLANAGAN
United States District Judge

43